A07A1493. AT&T CORPORATION v. PROPERTY TAX
SERVICES, INC.
(655 SE2d 295)

PHIPPS, Judge.

Beginning in the 1990s, Property Tax Services, Inc. (PTS) entered into a series of annual contracts with AT&T Corporation,

---

[25] See generally *Hudgins*, supra.

whereby PTS would provide tax services related to certain real properties owned by AT&T. PTS sued AT&T in 2005 for breach of contract, alleging that AT&T had failed to pay for work it performed for tax year 2003. It sought to recover the amount it had billed AT&T as its fee, plus interest and litigation expenses. AT&T denied liability and counterclaimed, alleging that PTS had breached the contract and committed negligence for tax years 2002 and 2003. AT&T sought to recover the amount it had paid PTS for tax year 2002, plus interest and litigation expenses. After a bench trial, the court summarily found in PTS's favor for both tax years, ordering AT&T to pay for the work PTS performed for tax year 2003, plus interest and attorney fees.

> Upon appellate review, factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The clearly erroneous test is the same as the any evidence rule. Thus, an appellate court will not disturb fact findings of a trial court if there is any evidence to sustain them.[1]

Because there is no evidence supporting the trial court's ruling in PTS's favor for tax year 2002, the judgment for that tax year is reversed. The record does support the trial court's ruling in PTS's favor for tax year 2003, and we affirm the judgment for that tax year. The case is remanded for proceedings not inconsistent with this opinion.

The underlying contracts for tax years 2002 and 2003 pertinently provided:

> [The commitments of PTS] will include the preparation and filing of real estate tax returns, where applicable, [and] an analysis of all assessed values.... [PTS] will initiate appeals to local taxing jurisdictions where [PTS] feels the need is warranted. It is expressly understood by all parties that the compensation in this agreement includes only the informal appeal levels up to and including any State Boards of Equalization. The FEE for this service will be TWENTY PERCENT (20%) of the total Ad Valorem Tax Savings on real property for [each tax year].... The tax savings will be based

---

[1] *KAR Printing v. Pierce*, 276 Ga. App. 511 (623 SE2d 704) (2005) (citation and punctuation omitted).

on the difference between the original proposed [2002 or] 2003 tax assessment and the final negotiated [2002 or] 2003 tax assessment.

To facilitate the tax services PTS would provide AT&T for tax years 2002 and 2003, AT&T's Southeast Area Tax Director, Joe DiBenedetto, signed and provided to PTS for each tax year a "Letter of Authorization" addressed to "Ad Valorem Tax Authorities and Others To Whom It May Concern." The letters notified any recipient that PTS was

> authorized to file real estate tax returns, where applicable, to change mailing addresses on tax rolls and digests, to investigate appraisals and assessments, to argue tax appeal cases in both informal review and formal review, to appear before administrative boards and agencies and, where authorized, to act as agent, and/or attorney-in-fact, with respect to these aforementioned rights on [certain of AT&T's real] properties. . . .

The real property underlying the disputes for both tax years is an office building located at 1200 Peachtree Street, Atlanta, Fulton County. As background, for tax year 2001, the Fulton County Board of Assessors (tax assessor) set the value of the property on that year's real estate assessment notice at over $42 million. A subsequent appeal by PTS to the Fulton County Board of Equalization (BOE) resulted in the BOE establishing in December 2001 the fair market value of the property at $27,505,600. AT&T paid PTS the amount it sought as its fee, $59,059.22.

For tax year 2002, PTS obtained in February 2002 from the tax assessor a tax return that still showed the value of the property at over $42 million. PTS returned the property at $27,500,000, notably $5,600 lower than the value established by the BOE for the previous tax year. The tax assessor then issued a real estate assessment notice, valuing the property at $37,669,400. PTS responded with an appeal letter to the tax assessor advising, "We wish to appeal the 2002 Fair Market Valuation on [1200 Peachtree Street] on the grounds that the current valuation is excessive based on comparability, uniformity, equity, and actual value." A subsequent appeal by PTS to the BOE resulted in the BOE establishing in January 2003 the fair market value of the property for tax year 2002 at $27,505,600, the same value it had established for the previous tax year. AT&T paid PTS the amount it sought as its fee, $41,225.18.

For tax year 2003, PTS obtained from the tax assessor in March 2003 a tax return that showed the value of the property at $37,669,400,

the amount the tax assessor had valued the property for tax year 2002. PTS returned the property at $27,505,600, notably the same value established by the BOE for the previous tax year. Thereafter, the tax assessor issued a real estate assessment notice, still valuing the property at $37,669,400. PTS responded with an appeal letter to the tax assessor advising, "We wish to appeal the 2003 Fair Market Valuation on [1200 Peachtree Street] on the grounds that the current valuation is excessive based on comparability, uniformity, equity, and actual value." A subsequent appeal to the BOE resulted in the BOE establishing the fair market value of the property for tax year 2003 at $27,760,600. PTS billed AT&T $39,358.94 as its fee for work performed for tax year 2003. In light of OCGA § 48-5-299 (c), which limits the circumstances under which county tax assessors may upwardly reassess property,[2] AT&T refused to pay the bill. The instant action ensued.

AT&T contends that the trial court should have ruled in its favor for both tax years 2002 and 2003. It asserts that, in light of the BOE-established valuation for tax year 2001, it was protected from higher reassessments for tax years 2002 and 2003 pursuant to OCGA § 48-5-299 (c) and related Ga. Comp. R. & Regs. r. 560-11-10-.09 (2) (c). AT&T claims that PTS was its agent and that it failed to perform its duties by neither advising it of the Code provision and rule nor asserting them on its behalf.

At the relevant time, OCGA § 48-5-299 (c) stated:

Real property, the value of which was established by an appeal in any year, that has not been returned by the taxpayer at a different value during the next two successive years, may not be changed by the board of tax assessors during such two years for the sole purpose of changing the valuation established or decision rendered in an appeal to the board of equalization or superior court. In such cases, before changing such value or decision, the board of assessors shall first conduct an investigation into factors currently affecting the fair market value. The investigation necessary shall include, but not be limited to, a visual on-site inspection of the property to ascertain if there have been any additions, deletions, or improvements to such property or the occurrence of other factors that might affect the current fair market value and a review to determine if there are any

---

[2] See *Pine Pointe Housing v. Bd. of Tax Assessors of Lowndes County*, 269 Ga. App. 855, 859 (2) (605 SE2d 443) (2004).

errors in the description and characterization of such property in the files and records of the board of tax assessors.[3]

AT&T points out that Ga. Comp. R. & Regs. r. 560-11-10-.09 (2) (c) provided that "[t]he appraisal staff shall observe the provisions of Code section 48-5-299 (c)"; that "a new appraisal must be accompanied by an on-site inspection to determine the occurrence of any changes to the property, errors in the appraisal staff's records or changes in the market forces affecting the value of the property since the appeal was heard that established the value of the property"; and that the appraisal staff may recommend

> to the board of tax assessors a change of assessment on the property that was the subject of the appeal when an appraisal based on current market conditions indicates the value has changed substantially from the value established by the recent appeal. Such appraisal shall be accompanied by a written statement attesting to the fact that an appraiser has conducted the required on-site inspection of the subject property and setting forth the reasons why the appraiser believes that a change of assessment is authorized under Code section 48-5-299 (c). . . . The written statement shall attest to at least one of the following: construction or renovation of the subject property has occurred since January 1 of the appeal year; an error has been discovered in the property records regarding the description or characteristics of the subject property; or extrinsic physical factors relative to the subject property have changed since January 1 of the appeal year that have substantially affected the appeal established value of such real property.

AT&T complains that for tax year 2002, PTS affirmatively waived its protections pursuant to the cited Code provision and rule by returning the property at a value other than the value the BOE established for tax year 2001. It complains that PTS essentially waived its protections for tax year 2003 by failing to assert the Code provision and rule in light of the appeal for tax year 2002. It accuses PTS of filing unneeded returns for tax years 2002 and 2003 because any adverse action by the tax assessor — i.e., valuing the property at

---

[3] The 2006 amendment, effective July 1, 2006, rewrote the above third sentence as the third and fourth sentences by substituting "market value. If a review" for "market value and a review," and added "discloses any errors, such errors shall not be the sole sufficient basis for increasing the valuation during the two-year period" at the end of the last sentence. Ga. L. 2006, p. 431.

a higher amount than the year before through a real estate assessment notice — would prompt the right to an appeal before the BOE. AT&T claims that PTS, either negligently or deliberately, allowed for a value dispute between AT&T and the tax assessor and then initiated unnecessary appeals before the BOE. According to AT&T, this approach by PTS served only to generate its fees and was solely in PTS's own interest.

AT&T showed that PTS earned a fee by establishing on appeal to the BOE a valuation lower than the tax assessor's valuation as set forth on a real estate assessment notice. The contract between the parties provided that the fee was calculated as 20 percent of the "tax savings on real property" for each tax year. William Boden, an owner and managing partner of PTS, confirmed that the "tax savings" was calculated as the difference between "the initial evaluation per the notice versus the final evaluation per appeal action." Likewise, DiBenedetto testified that PTS's fee was based on the difference between "the original assessment and . . . the revised assessment." He, too, confirmed that if no appeal was involved, PTS would be paid "nothing."

To support its claim that PTS could have resolved informally with the tax assessor valuation mistakes for tax years 2002 and 2003, AT&T presented expert testimony on tax assessment appeals. According to this witness, a commercial property owner would file a tax return "to contest the value[;] otherwise the value rolls from year to year until the county issues an assessment notice." He testified that if he noted that a tax return form contained an incorrect value, "[his company] would notify the appraiser staff of an error and bring in whatever documentation we have of a corrected value and they would correct the original notice and we would proceed from there." The witness explained that, where the taxpayer instead files a return estimating the property's fair market value and the tax assessor thereafter rejects the taxpayer estimation, a real estate assessment notice is generated by the tax assessor showing the tax assessor's valuation. The taxpayer may then appeal to a board of equalization. Filing a tax return, he stated, "initiates the appeals process. It will generate a value notice."

To further support its claim that the returns and appeals were unnecessary, AT&T presented DiBenedetto's testimony about tax year 2004, when AT&T and PTS did not enter a contract with PTS for property tax services. DiBenedetto recounted that "the county came up with the identical value as the 2003 BOE decision"; neither a tax return nor an appeal was filed; "the value was exactly identical to the 2003 value, which proves that the county follows the law"; and AT&T "didn't have to pay Mr. Boden a fee to achieve that value."

1. As an initial matter, the record establishes that for both tax years, PTS was AT&T's agent with respect to property tax services for 1200 Peachtree Street.[4] Thus, several principles apply.

> The duties of an agent depend initially on his contract with the principal, but in every agency relationship the law imposes certain duties whether they are expressly included in the contract or not. As a fiduciary the agent is required to act primarily for the benefit of the principal in matters connected with the agency. Among the agent's fiduciary duties is to act with proper skill and diligence, and not to make a personal profit from the agency. Moreover, the agent is subject to the duty of loyalty to his principal and must deal fairly with him at all times. The principal has the right to expect from his agent a full revelation of all pertinent facts which might jeopardize . . . rights in the property entrusted to the . . . agent[.] Thus it has been held that an agent having made a contract for his principal must pass on to him, all the evidence and information in reference to such contract in his possession. The general rule is that all material facts within the agent's knowledge concerning the subject matter of the agency or any transaction into which he enters in his representative capacity must be communicated to the principal. One reason an agent is under a duty to communicate to his principal all pertinent and material facts concerning any transaction entered into on behalf of the principal is that knowledge of an agent is imputed to the principal by law and only by the agent's performance of this duty can the principal acquire actual knowledge and govern or protect himself accordingly.[5]

Moreover, "the agent may not make a profit for himself out of the relationship, or out of the knowledge obtained from the relationship, to the injury of the principal. The relationship of principal and agent demands of the agent the utmost loyalty and good faith to his principal."[6]

---

[4] See OCGA § 10-6-1 ("The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."); *Southern Exposition Mgmt. Co. v. Genmar Indus.*, 250 Ga. App. 702, 704 (551 SE2d 830) (2001).

[5] *Dawes Mining Co. v. Callahan*, 246 Ga. 531, 534-535 (272 SE2d 267) (1980) (citations and punctuation omitted).

[6] *Koch v. Cochran*, 251 Ga. 559, 560 (307 SE2d 918) (1983).

Guided by these principles, we consider the facts and circumstances related to the tax years at issue.

2. AT&T has shown that the trial court erred by ruling in PTS's favor for tax year 2002.

By returning the property at a value other than the value established by the BOE for the previous tax year, PTS eliminated the benefit of OCGA § 48-5-299 (c) and opened the door for the tax assessor to reassess the property for the "sole purpose of changing the valuation established or decision rendered in an appeal."[7] Then, after the tax assessor issued a real estate assessment notice with a value higher than the BOE valuation for the previous tax year, PTS pursued a BOE appeal.

The record before us contains no transcript for either BOE hearing, but the record does reveal that for tax year 2002, issues of uniformity of assessment and the fair market value of the property were raised at the BOE hearing; that the BOE thereafter set the value for tax year 2002 at the same amount it had set for the previous tax year; and that its valuation was "based on evidence." The only conclusion we can reach from this record is that the tax assessor had no competent evidence to support its higher assessment, but changed the value of the property "for the sole purpose of changing the valuation established or decision rendered in an appeal."[8] These circumstances fell squarely within the protections contemplated by OCGA § 48-5-299 (c).[9]

But when Boden was asked at trial whether he had pursued an argument that OCGA § 48-5-299 (c) barred a higher reassessment, he answered, "I argued the merits of the case and the value of the case and what we thought was pertinent. And our case was built around trying to get a number in the low 20s, so I suspect not. I mean, it just wasn't something that was germane to our appeal work."

The appeal for tax year 2002 resulted in the BOE establishing the fair market value of the property at the same amount it had set for the previous tax year, but PTS charged AT&T $41,225.18 for the approach it took to obtain this result. PTS presented no adequate explanation for making a profit for itself for that tax year, in light of OCGA § 48-5-299 (c), which the record shows entitled AT&T to the same valuation — without an appeal and thus without a fee charged by PTS.

---

[7] *DeKalb County v. Wellborn Road Common Tenancy*, 276 Ga. App. 14, 15 (622 SE2d 409) (2005) (quoting OCGA § 48-5-299 (c)).

[8] OCGA § 48-5-299 (c); see *Wellborn Road Common Tenancy*, supra at 15-16.

[9] See *Wellborn Road Common Tenancy*, supra.

PTS defends the approach it took by pointing to contractual language that "[PTS] will initiate appeals to local taxing jurisdictions where [PTS] feels the need is warranted." It also cites Boden's testimony that, during the relevant time period, the tax assessor commonly disregarded OCGA § 48-5-299 (c), and he therefore felt that an appeal was warranted. But neither the cited language nor Boden's anticipation that the tax assessor would not have adhered to the Code provision even if he had asserted it relieved PTS of its duties imposed by law.[10]

There is no evidence in the record supporting the trial court's implicit finding that PTS did not materially breach the contract. And AT&T has shown merit in its claim that, in light of OCGA § 48-5-299 (c), PTS's work for tax year 2002 was "worthless or should never have been performed in the first place" and that, under the circumstances, it was damaged in the amount it paid PTS for that tax year.

3. AT&T has not shown that the trial court erred by ruling in PTS's favor for tax year 2003.

PTS points out that it returned the property for tax year 2003 at the same value as that established by the BOE the previous tax year and thereby did not waive the statutory and regulatory protections cited by AT&T.[11] In addition, PTS asserts that notwithstanding those provisions, improvements to the property and its surrounding area allowed for the tax assessor's higher reassessment. Boden testified that during the relevant time period, the part of town in which the property was located, Midtown, was undergoing a renaissance that tended to raise property values. He also testified that building permits had been pulled in connection with the property and that the tax assessor was aware of the permits. In late Fall 2002, he visited the office building and observed construction work being done. Boden testified that prior to the appeal letter for tax year 2003, he had concluded that these circumstances provided the tax assessor with grounds for an upward reassessment.

As AT&T concedes, OCGA § 48-5-299 (c) does not completely bar reassessments for the two successive years following an appeal. Rather, as set forth above, the Code provision and the cited rule outline the circumstances under which county tax assessors may upwardly reassess the property.[12] As we have recognized:

---

[10] See *Koch*, supra; *Dawes Mining Co.*, supra.

[11] *Wellborn Road Common Tenancy*, supra ("[OCGA § 48-5-299 (c)] makes it clear that for two successive years after the value of property has been determined in an appeal, if a taxpayer returns the value of real property *at the amount established by the appeal*, it cannot be reassessed 'for the sole purpose of changing the valuation established or decision rendered in an appeal.'") (emphasis supplied) (quoting OCGA § 48-5-299 (c)).

[12] See *Pine Pointe Housing*, supra.

It is beyond argument that [a] property owner can abuse the tax law by . . . improving realty, making no return, and allowing an automatic return at a prior year's fair market value and avoid the fair share of ad valorem taxes due. However, the county board of tax assessors has available to it the county- or municipality-issued building permits . . . , which should trigger visual inspection of the property for tax assessment purposes long before the property has to be returned in a tax year.[13]

In the instant case, a senior real estate appraiser with the Fulton County Board of Assessors testified that the figure at which the tax assessor reassessed the property for tax year 2003 was based upon several considerations. Between November 2001 and April 2002, five building permits were pulled, totaling $260,170 to repair and remodel the building. He explained that, while a valuation by the tax assessor is as of January 1 of the tax year, a permit pulled after October 1 typically is not considered "until the following tax year because normally the work doesn't get done in that short time period so we have to have a cut off." This witness further testified that another consideration that underlay the reassessment was the tax assessor's discovery that land had been "purchased from . . . an adjacent parcel which was . . . approximately 16,000 square feet that was added to the subject for tax year 2003. And it doesn't sound like a lot of square footage but the land was being valued at $40.00 per square foot at the time."

Nevertheless, AT&T complains that the tax assessor failed to comply with Ga. Comp. R. & Regs. r. 560-11-10-.09 (2) (c) in reappraising the property. Specifically, it charges that the tax assessor never prepared the "written statement" described by the rule, and it cites Boden's testimony that he never saw such a "written statement."

Although AT&T adduced evidence that the written statement contemplated by the rule was not prepared, this evidence falls short of showing reversible error. The record does not demand a finding that PTS could have successfully argued that AT&T was entitled to be free of a higher reassessment under OCGA § 48-5-299 (c) and the cited rule. Instead, the evidence authorized a finding that, had PTS asserted those provisions, the tax assessor would have been able to comply therewith and still reassess the property. Regarding the

---

[13] *Cobb County Bd. of Tax Assessors v. Morrison*, 249 Ga. App. 691, 694-695 (548 SE2d 624) (2001) (citation omitted).

written statement described by the rule, the tax assessor's representative testified, "We don't have a written statement . . . per se. We have information on our documents that attest the fact that the characteristics were changed and there are permits that were taken out on the property and permits were gone out on. Meaning there was a field inspection." Furthermore, the record reveals that, at the BOE hearing, issues of uniformity of assessment and fair market value were raised; that thereafter, the BOE set the property value for tax year 2003 $255,000 higher than the amount it had set for the previous tax year; and that such higher valuation was "based on evidence presented." Under these circumstances, the evidence allowed the trial court to find that PTS did not breach the contract or commit negligence by not asserting the cited provisions, but reasonably determined that "additions, deletions, or improvements to [the] property or the occurrence of other factors" had affected the property's current fair market value such that AT&T was no longer entitled to the BOE-established valuation for tax year 2002.[14] Evidence that the appeal initiated for tax year 2003 to the BOE yielded to AT&T a "tax savings," as contemplated by the contract, supports the trial court's ruling that AT&T was liable to PTS for the fee charged for that tax year.

Finally, despite AT&T's complaint that PTS breached duties by failing to inform it of OCGA § 48-5-299 (c), the cited related rule, and its options under the circumstances, "[b]reach of duty is not enough; negligence alone is insufficient to sustain recovery."[15] There must also be "some loss or damage flowing to the [complainant's] legally protected interest as a result of the alleged breach of the legal duty."[16] Here, the evidence authorized the trial court to find that AT&T demonstrated no resulting loss or damage for tax year 2003.

*Judgment affirmed in part and reversed in part, and case remanded. Johnson, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 30, 2007.

*Troutman Sanders, Norman L. Underwood, John G. Rigney*, for appellant.

*Edward F. Danowitz, Jeffrey A. Lepchenske*, for appellee.

---

[14] OCGA § 48-5-299 (c).
[15] *Hudson v. Swain*, 282 Ga. App. 718, 721 (639 SE2d 319) (2006) (punctuation omitted).
[16] Id.